## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KENITE WEBB,

     Plaintiff,

v.                                    Case No. 8:19-cv-3045-TPB-TGW

CITY OF VENICE,

     Defendant.

_____/

### ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE A NEW TRIAL

This matter is before the Court on Defendant's motion for judgment as a matter of law made orally at trial (Docs. 133; 136) and "Defendant's Renewed Motion for Judgment as a Matter of Law or in the Alternative a New Trial," filed March 21, 2022. (Doc. 150). Plaintiff filed a response in opposition on April 11, 2022. (Doc. 154). Upon review of the motion, response, court file, and record, the Court finds as follows:

### Background

Defendant City of Venice is a municipality in Sarasota County, Florida. Plaintiff Kenite Webb has been an officer with the Venice Police Department ("VPD") since 2015. Plaintiff asserts that beginning in late 2017, he was subjected to racial discrimination, harassment, and retaliation by Defendant and, more specifically by the VPD. On May 5, 2020, Plaintiff filed an amended complaint alleging five counts: (1) violation of 42 U.S.C. § 1983 – Discriminatory Custom; (2)

violation of Title VII – Discrimination Based on Race; (3) violation of Title VII – Retaliation; (4) violation of Florida Civil Rights Act of 1992 ("FCRA") – Discrimination Based on Race; (5) violation of FCRA – Retaliation.  The Court granted Defendant's motion for summary judgment as to all claims except Plaintiff's claim for hostile work environment under Title VII and the FCRA.

The case was tried to a jury from February 7 to February 11, 2022.  Plaintiff during the relevant times was one of only two black officers at the VPD.  He presented evidence that beginning in late 2017, he experienced multiple incidents of offensive, race-based insults and conduct that he believed targeted him because of his race.  At the close of Plaintiff's case and again at the close of all the evidence, Defendant orally moved for judgment as a matter of law, arguing that the evidence was insufficient to support a jury finding that a hostile work environment existed.  The Court deferred ruling on the motion.[1]

The jury returned a verdict in Plaintiff's favor, but it was inconsistent.  After resubmission, the jury corrected the inconsistency and awarded Plaintiff $50,000.

After trial, Defendant timely filed a renewed motion for judgment as a matter of law, arguing the evidence was insufficient to support a jury verdict for Plaintiff on the hostile work environment claim.  Defendant alternatively moved for a new trial on the ground that the verdict was against the weight of the evidence, that the

---

[1] Defendant also argued that the evidence failed to support instructing the jury on a hostile work environment claim based on a theory of vicarious liability.  The Court agreed and instructed the jury only on a theory of direct liability, which is the only claim at issue on this motion.

Court erred in admitting certain items of evidence, and that the Court erred in resubmitting the case to the jury following the initial inconsistent verdict.

## Legal Standard

### *Judgment as a Matter of Law*

The standard for granting a pre-submission motion and a renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50 is the same. *Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1227 (11th Cir. 2007) (citing 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537 (2d ed. 1995)). Judgment as a matter of law is appropriate "when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005). Thus, the motion should be denied "if there was any legally sufficient basis for a reasonable jury to find in favor of the nonmoving party." *Marlite, Inc. v. Eckenrod*, 537 F. App'x 815, 816 (11th Cir. 2013) (citing *Pensacola Motor Sales, Inc. v. Eastern Shore Toyota, LLC*, 684 F.3d 1211, 1226 (11th Cir. 2012)).

In assessing the sufficiency of the evidence, the court must view all the evidence adduced and draw all reasonable inferences in the light most favorable to the nonmoving party, without making credibility determinations or weighing the evidence. *United States v. Approximately $299,873.70 Seized from a Bank of America Account*, 15 F.4th 1332, 1342 (11th Cir. 2021); *Mendez v. Unitrin Direct Prop. & Cas. Ins. Co.*, 622 F. Supp. 2d 1233, 1236 (M.D. Fla. 2007).

### *New Trial*

"A timely motion for new trial is addressed to the sound judicial discretion of the trial court." *Knight through Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 807 (11th Cir. 2017) (internal quotation omitted). When considering a motion for new trial based on the weight of the evidence, the court must determine whether "the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir. 1984) (internal quotation omitted). To assure that the court does not substitute its judgment for that of the jury, "new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence." *Id.* (quoting *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980)).

The admission and exclusion of evidence are matters committed to the broad discretion of the district court. *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995). To obtain a new trial based on an erroneous evidentiary ruling, the movant must show that the erroneous ruling produced a substantial prejudicial effect. *See SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 790 (11th Cir. 2005). A court "may conclude that the party's substantial rights were not affected [as long as the court] . . . can say with fair assurance . . . that the judgment was not substantially swayed by the error." *Id.* (internal quotation omitted).

The decision to resubmit a case to the jury when the jury's findings are

inconsistent or unclear is similarly a matter committed to the district court's discretion. *See Wilbur v. Corr. Services Corp.*, 393 F.3d 1192, 1199 (11th Cir. 2004); *Burger King Corp. v. Mason*, 710 F.2d 1480, 1489 & n.5 (11th Cir. 1983).

## Analysis

### *Judgment as a Matter of Law*

Title VII prohibits racial discrimination against individuals with respect to compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1).[2] An employer violates Title VII when it discriminates against an employee by actions that cumulatively create a hostile work environment that brings about a material change in the terms and conditions of employment. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc); *Ng v. Brennan*, 8:17-cv-509-T-36AEP, 2019 WL 2436581, at *4 (M.D. Fla. June 11, 2019).[3]

Plaintiff here obtained a jury verdict on his hostile work environment claim. To prevail on a hostile work environment claim, a plaintiff must show that "(1) he is a member of a protected group; (2) who has been subjected to unwelcome harassment; (3) based on a protected characteristic; (4) that was sufficiently severe or pervasive to alter the terms and conditions of employment and create a

---

[2] Discrimination claims under the FCRA are governed by the same standards as claims under Title VII. *See, e.g.*, *DeBose v. USF Bd. of Trustees*, 811 F. App'x 547, 553-54 (11th Cir. 2020), *cert. denied sub nom. DeBose v. Univ. of S. Florida Bd. of Trustees*, 141 S. Ct. 2518 (2021). Neither side requested that the jury be separately instructed as to the FCRA claim, nor have they argued any different standard applies to the FCRA claim for purposes of this motion. Accordingly, this Order addresses Defendant's motion in terms of Title VII.

[3] *Reeves* involved sexual harassment, but claims of racial harassment are generally reviewed under the same standards. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787 n.1 (1998); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002).

discriminatorily abusive working environment; and (5) that his employer is vicariously or directly liable for the environment." *Ng*, 2019 WL 2436581, at *6 (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

Defendant argues that Plaintiff failed to present evidence that he was subjected to harassment based on race that was sufficiently severe or pervasive to alter the terms and conditions of his employment, that he failed to present evidence that Defendant was liable for any hostile work environment that existed, and that he failed to present evidence of damages.

<u>Severe or Pervasive Harassment Based on Race</u>

In assessing whether alleged actions were sufficiently severe or pervasive to create a hostile work environment, courts look to the totality of the circumstances, including the frequency of the conduct, its severity, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's job performance. *E.g., Ng,* 2019 WL 2436581, at *6. Petty office squabbles, communication issues, and "ordinary workplace tribulations" are insufficient to create a hostile work environment. *See, e.g.*, *Mahone v. CSX Transp., Inc.*, 652 F. App'x 820, 823 (11th Cir. 2016); *Baroudi v. Sec'y, U.S. Dep't of Veterans Affairs*, 616 F. App'x 899, 905 (11th Cir. 2015).

Construing the evidence and all inferences in the light most favorable to Plaintiff, a reasonable jury could have found the following:

- In late December 2017, Plaintiff reported to Lieutenant Jessica Chappa that racist graffiti (specifically, the word "nigger") had been scrawled on rocks in a public park. Rather than have the public works department remove the graffiti, Chappa ordered Plaintiff himself to do so, over his objection. Plaintiff carried out the order, but felt flustered and dehumanized. Although

Plaintiff reported the vandalism as a hate crime, Chappa failed to initiate an investigation into this incident and, by ordering the graffiti covered over, she failed to preserve evidence related to it.

- Shortly after that, Plaintiff attempted to speak with Sergeant Andy Leisenring at roll call.  Sergeant Aleksander Gregoire, within the hearing of other officers, stated, "When you get done sucking his dick, you come suck my dick.  That's what ya'll like to do."[4]  The first black officer hired by the VPD had been gay.  Plaintiff therefore understood Sergeant Gregoire's remark about what "ya'll like to do" to refer to both blacks and gays.  When Plaintiff complained to Sergeant Leisenring, Leisenring shrugged it off, telling Plaintiff that police officers sometimes say "inappropriate" things.  Gregoire was never disciplined or counseled for this offensive public abuse.  Plaintiff felt belittled, disrespected, and uneasy.

- In March or April 2018, Sergeant Gregoire filed an internal complaint against Plaintiff purportedly based on a citizen complaint concerning sexual misconduct by Plaintiff while on the job.  Plaintiff believes the investigation occurred because he is black and in retaliation for Plaintiff's earlier reporting of improper sexual activity on the job engaged by another officer, who was white.  The complaint against Plaintiff was ultimately determined by Chief Mattmuller to be unsubtantiated, and Plaintiff was not disciplined.

- In April 2018, Plaintiff found a banana in the trunk of his patrol car, left there by Officer Bill Long, who had used the vehicle on an earlier shift.  Plaintiff testified that Long referred to Plaintiff simply as "black" rather than by his first name or as "Officer Webb."  When Plaintiff discussed the banana issue with Long, Long made a statement to Plaintiff connecting the eating of bananas with "primates."  Plaintiff complained informally to Lieutenant Resch and Sergeant Gregoire about the incident, and complained to Chief of Police Thomas Mattmuller that "[s]omebody thought it was funny that, you know, blacks are like primates," but no action was taken.

- Around the same time, Plaintiff observed on Long's laptop in their shared patrol car an image of a smiley face with a bullet hole in it and blood dripping down.  Long told Plaintiff, "This is what happens to snitches," which caused Plaintiff to become fearful.  Plaintiff reported the matter to his supervisors, Lieutenant Resch and Sergeant Gregoire, and to Chief Mattmuller, but no action was taken.

---

[4] Neither party ordered an official transcript.  In preparing this Order, the Court has had access to uncertified rough transcripts of the trial.  Citations to specific transcript pages are therefore unavailable and quotations may be inexact.  The parties should contact the court reporter if official transcripts are needed for further review.

- In May 2018, Sergeant Gregoire became irate because Plaintiff had ticketed Gregoire's daughter for a traffic accident. Back at the police station near the men's locker room, Gregoire lunged at Plaintiff, threatening him, "I should fuck your black ass up." Lieutenant Todd Resch interceded, moving between Gregoire and Plaintiff. As Gregoire moved away, he called out, "I hate you, you fucking nigger." As this had occurred in front of Lieutenant Resch, Plaintiff asked Resch whether he was going to take action, but Resch did nothing.

- At some point, Sergeant Gregoire and Plaintiff were on patrol on Venice Island, when Gregoire, for no apparent reason, brought up a repealed city ordinance that prohibited blacks from being on the island after sunset. According to Plaintiff, Gregoire said "[Y]ou know black folks are not allowed here on the island after dark. If you do, this is what happens. You'll get beat down. You will get charged $50 or you'll go to jail. Two out of the three will happen." Plaintiff took this comment as a threat.

- The VPD had a "Black Suspects" book sitting on a shelf in a "detective's room" at least up to the time the VPD changed offices in 2020. The book was no longer in use, yet Defendant's witnesses offered no explanation as to why it remained on display on the shelf. No other similar books concerning other categories of suspects were present.

- Due to his treatment at work, Plaintiff felt depressed and anxious, his relationship with Officer Long became hostile, and he no longer trusted his white coworkers to back him up. His belief that Sergeant Gregoire might be trying to set him up led to his refusal to sign an acknowledgment form at a training exercise which, in turn, led to a charge of insubordination.

Defendant argues that the evidence failed to show harassment sufficiently severe or pervasive to support the jury's finding of a hostile work environment, citing cases in which courts have held evidence of seemingly egregious conduct insufficient to go to a jury. *See, e.g., Barrow v. Ga. Pacific Corp.*, 144 F. App'x 54, 58 (11th Cir. 2005) (affirming a summary judgment for the defendant and characterizing evidence that supervisors used racial epithets on multiple occasions as "isolated, sporadic instances of racial harassment over [the plaintiff's] more than fourteen years of employment"). However, the inquiry into whether a hostile work

environment existed is case-specific and "is not, and by its nature cannot be, a mathematically precise test." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). The context of offending words and conduct is important. *See Reeves*, 594 F.3d at 810. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998); *Reeves*, 594 F.3d at 810 (same, quoting *Oncale*). Thus, the inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81.

This is admittedly a close case. However, if Plaintiff's evidence is believed and all reasonable inferences drawn in his favor, a reasonable jury could find that Plaintiff experienced harassment based on his race which, considered "cumulatively and in the totality of the circumstances," *Reeves*, 594 F.3d at 808, went well beyond "ordinary workplace tribulations" and altered the terms and conditions of his employment. In reaching this conclusion, the Court is influenced by a number of factors. These include: (1) the public and humiliating nature of the graffiti and roll call incidents, (2) the use of derogatory racial epithets and symbolism by Gregoire and Long, (3) verbally and physically threatening statements and conduct by Gregoire and Long, (4) Plaintiff's position as one of only two black officers at the VPD, (5) the stressful nature of police work and the need for trust between officers, (6) the fact that the majority of the incidents specifically targeted Plaintiff, and (7)

Plaintiff's testimony regarding the impact of the incidents on his emotional state and his work.

The Court is also influenced by evidence that supervisory personnel, expressly charged by Defendant with enforcing prohibitions on harassment, personally participated in the harassment or witnessed harassment but did nothing to stop or report it to higher management. This conduct could well signal to a reasonable employee in Plaintiff's position that his employer has effectively adopted the offending conduct. *See Reeves*, 594 F.3d at 811 (observing that "an employer's knowledge and refusal to act may be read as 'the employer's adoption of the offending conduct and its results'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998)).

Defendant argues that only one instance of racial harassment was shown – Sergeant Gregoire's angrily telling Plaintiff "I hate you, you fucking nigger" – and contends that no reasonable jury could conclude that any of the other incidents could be construed as racial harassment.[5] The Court disagrees. Most of the incidents overtly involved race and could reasonably be construed as involving ridicule or insult. Defendant argues that Gregoire's offensive remark at roll call that Plaintiff could "suck [his] dick" because "that's what ya'll like to do" had no racial implication. But this ignores the fact that the first black VPD officer was gay, and also ignores Gregoire's other racially offensive conduct. Whether Gregoire

---

[5] "'The use of the slur "nigger" is severe.'" *Cooler v. Layne Christensen Co.*, 710 F. App'x 842, 848 (11th Cir. 2017) (quoting *Adams v. Austal, USA, LLC*, 754 F.3d 1240, 1250 (11th Cir. 2014)).

intended the remark as a racial insult or, as Defendant would have it, simply as a "crude" remark, presented a question for the jury.

The internal affairs investigation into alleged misconduct by Plaintiff, which Chief Mattmuller ultimately determined to be unsupported, did not expressly implicate race. But it was initiated by Sergeant Gregoire close in time to his involvement in other, racially charged incidents. The Court instructed the jury that Plaintiff was required to prove harassment of Plaintiff "because of his race" and further gave a special instruction – at Defendant's request and over Plaintiff's objection – that Defendant could take disciplinary action for any reason, good or bad, fair or unfair, as long it was not based on race. The jury reasonably could have taken into account all of Gregoire's conduct and concluded that he initiated the investigation targeting Plaintiff because of his race. *See Smith v. City of New Smyrna Beach*, No. 6:11-cv-1110-Orl-37KRS, 2013 WL 5230659, at *9 (M.D. Fla. Sept. 16, 2013) (holding that where much of the alleged conduct was overtly gender-based, the jury was entitled to infer that other unwelcome conduct was also based on gender), *aff'd*, 588 F. App'x 965 (11th Cir. 2014).[6]

The jury, which included individuals with management experience, and training in workplace fairness issues, was entitled to weigh the evidence in this close case, credit Plaintiff's version of the various events, and reach its own

---

[6] Other incidents presented by Plaintiff at trial, neither overtly racial nor close in time to the more egregious incidents discussed above, appear to have been "ordinary workplace tribulations" rather than racial harassment. These include a reprimand Plaintiff received for insubordination in March 2019 and incidents in late 2019 described by Plaintiff in a January 2020 internal complaint. The Court has not considered these incidents in determining whether Plaintiff presented sufficient evidence of a hostile work environment.

conclusions about the events and about the actors' intentions and motivations.  *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (explaining that it is the task of the jury, not the court, "to weigh conflicting evidence and inferences, and determine the credibility of witnesses") (internal quotation omitted).  Plaintiff presented sufficient evidence for a reasonable jury, assessing the conduct "cumulatively and in the totality of the circumstances," to find that Plaintiff was subjected to a hostile work environment.  *Smith*, 588 F. App'x at 987; s*ee also Cooler v. Layne Christensen Co.*, 710 F. App'x 842, 847-49 (11th Cir. 2017) (holding that a supervisor's use of the slur "nigger" in a context arguably intended to humiliate the plaintiff, together with other evidence of racial hostility, created an issue of fact as to whether a hostile work environment existed); *Adams v. Austal*, 754 F.3d 1240, 1250-54 (11th Cir. 2014) (holding that plaintiffs who experienced racial slurs targeting them personally, combined with other evidence, created an issue of fact on the existence of a hostile work environment); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299-1304 (11th Cir. 2012) (concluding that seven incidents of racist acts over a one year period, including incidents involving the placing of banana peels on the plaintiff's truck, raised an issue of fact on the existence of a hostile work environment).

<u>Direct Liability of Defendant</u>

A plaintiff who has proven a hostile work environment must also prove that his employer is legally responsible for that environment.  To meet this element, a plaintiff must show the defendant (1) knew or should have known of the hostile work environment, but (2) failed to take prompt and appropriate remedial action.

*See Miller*, 277 F.3d at 1280; *Smith v. City of New Smyrna Beach*, 6:11-cv-1110-Orl-37KRS, 2012 WL 6721002, at *8 (M.D. Fla. Dec. 27, 2012).

When Defendant moved for judgment as a matter of law at trial, it did not argue that Plaintiff had failed to present evidence to support a verdict in his favor on the issue of Defendant's legal responsibility for the hostile work environment. Accordingly, arguments on these issues were not preserved for the renewed motion, and the motion as to this ground is therefore due to be denied. *See, e.g., Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 902-03 (11th Cir. 2004) (holding that a post-trial motion for judgment can be granted only on grounds advanced in a pre-verdict motion). However, the Court will address Defendant's arguments on this point for the sake of completeness.

### Notice or Knowledge of the Hostile Work Environment

An employer will be deemed to know of a hostile work environment when an employee lodges a complaint with a corporate officer or other person sufficiently high in the entity's management structure for his or her knowledge to be imputed to the entity. *See, e.g., Miller*, 277 F.3d at 1279. However, where an employer designates particular employees as authorized or required to address or report harassment, their knowledge is also imputed to the employer regardless of their position in the corporate hierarchy. *See, e.g., Breda v. Wolf Camera & Video*, 222 F.3d 886, 889-90 (11th Cir. 2000) (holding that information provided to store managers constituted actual notice to the company where the company had designated store managers as representatives to whom complaints of sexual harassment could be made).

In this case, Defendant's anti-harassment policy provided that complaints should be made to the employee's supervisor and the human resources director, but also provided that "[m]anagers who know or become aware of potential harassment" have a duty to report complaints to the human resources department. (Doc. 142-1, Pl. Ex. 1). The VPD's standard operating procedure on harassment required all employees to report known harassment to a supervisor, and allowed them to do that informally as well as formally. (Doc. 142-9, Pl. Ex. 128). The standard operating procedure further provided that supervisors must keep the workplace free of harassment, and required supervisors with knowledge of harassment to take immediate action to stop it, inform victims of their right to file a complaint, and report the situation to the Chief of Police. (*Id.*).[7]

Thus, based on Defendant's own policies and procedures, knowledge of harassment obtained by supervisors, including knowledge obtained by personal observation, is imputed to Defendant for purposes of Plaintiff's hostile work environment claims. *See Smelter v. So. Home Care Services Inc.*, 904 F.3d 1276, 1287 (11th Cir. 2018) (holding that where a branch manager overheard racist comments, an issue of fact was created as to whether the corporate employer had actual notice of the hostile work environment).

Plaintiff's evidence showed that sergeants, lieutenants, and the Chief of Police, all of whom were supervisors, witnessed or were informed of multiple acts of

---

[7] Although the standard operating procedure focused on sexual harassment, it included racial harassment within its scope. *See* (Doc. 142-9, Pl. Ex. 128, at § III.B, D).

harassment.[8]  In April 2018, Plaintiff complained to Lieutenant Resch that he felt he was being subjected to a hostile work environment.  Later in 2018, Plaintiff filed a formal complaint with the EEOC, which was sent to Defendant's human resources department.  Although the EEOC complaint itself was not in evidence, Defendant's human resources director Allen Bullock testified that such a complaint is filed to allege discrimination as a precondition to filing a lawsuit, and that the 2018 complaint set forth Plaintiff's claims as to the nature of the alleged harassment, including allegations regarding the graffiti incident.

Based on the foregoing, there was sufficient evidence to support a jury finding that Defendant, through supervisory personnel charged with addressing harassment, knew or should have known of the hostile work environment claimed by Plaintiff.[9]

*Prompt Remedial Action*

The jury also reasonably concluded Defendant took no steps to remedy the hostile work environment the jury found existed.  In fact, Defendant's position is

---

[8]  Defendant argues that the Court ruled that sergeants and lieutenants, as a matter of law, were not "higher management," because they were not empowered to take tangible employment actions.  The Court only ruled that these individuals were not "supervisors" in the specific and limited sense required under *Vance v. Ball State Univ.*, 570 U.S. 421 (2013), for vicarious liability.  For purposes of direct liability, however, the only theory submitted to the jury, the issue is not whether these individuals could take tangible employment actions, but whether they were authorized to address and report harassment.

[9]  Defendant argues that Plaintiff did not complain about various incidents argued at trial as part of the hostile work environment.  However, an employer need not be aware of every claimed instance of harassment.  *See, e.g., Smelter*, 904 F.3d at 1287 (holding that an issue of fact was presented as to the employer's knowledge based on a supervisor's overhearing "at least some" of the alleged racist comments).  The key inquiry is whether individuals designated to address harassment had enough information that they could be expected to take corrective action.  *See Madray v. Publix Supermarkets Inc.*, 208 F.3d 1290, 1300-01 (11th Cir 2000).  In this case, the jury reasonably could have found they did.

that Plaintiff's contentions of racial harassment lacked merit, which logically

implies no remedial action was required.  Defendant argues its investigation of a

January 2020 internal complaint by Plaintiff constituted prompt remedial action as

a matter of law.  That investigation, however, addressed incidents that occurred in

late 2019, long after Defendant was on notice of the other incidents of harassment

described above and long after Plaintiff filed his EEOC complaint.  The 2020

internal complaint did not mention race.  The investigating officer, Lieutenant

Jason Adams, did not discuss race in his report, nor did he interview Sergeant

Gregoire.  The evidence, taken as a whole, presented an issue for the jury as to

whether Defendant took prompt and appropriate remedial action.

<u>Damages</u>

Defendant argues Plaintiff failed to prove damages.  Defendant made no

argument on this ground in its motion for judgment as a matter of law at trial and,

therefore, this argument was not preserved.  *See Doe v. Celebrity Cruises, Inc.*, 394

F.3d at 902-03.  Again, however, the Court will address the argument for the sake of

completeness.

Damages under Title VII include emotional pain, suffering, inconvenience,

mental anguish, and loss of enjoyment of life.  *See, e.g.*, *Davis v. Fla. Agency for*

*Health Care Admin.*, 612 F. App'x 983, 987 (11th Cir. 2015); *Sublett v. Landshark*

*Group, Inc.*, 1:20-cv-128-AW-GRJ, 2021 WL 5055074, at *10 (N.D. Fla. Aug. 26,

2021), *report and recommendation adopted*, 2021 WL 5052729 (N.D. Fla. Nov. 1,

2021).  There is no requirement that Plaintiff demonstrate a tangible impact on his

employment, such as a reduction in salary.  *See, e.g.*, *Harris*, 510 U.S. at 22.

Plaintiff testified that because of his treatment at work, he felt depressed and anxious, lacked energy, and had difficulty sleeping.  He discussed his work-related issues with his psychiatrist.  On the job, he felt that he no longer trusted his white co-workers to back him up in dangerous situations.  Outside of work, the stress led to fights with his girlfriend and caused Plaintiff to become more isolated.  The evidence supported the jury's damage award.  *See, e.g., Hearn v. Gen. Elec. Co.*, 927 F. Supp. 1486, 1500 (M.D. Ala. 1996) (awarding two employees $50,000 and $20,000, respectively, as the amount that would "reasonably and fairly compensate" them for the emotional distress they suffered).  Accordingly, Defendant's motion for judgment as a matter of law on this ground is denied.

## *Motion for New Trial*

### Weight of the Evidence

Defendant argues that the verdict was contrary to the great weight of the evidence, which it contends established conclusively that the more egregious incidents involving Sergeant Gregoire did not occur and that the other incidents were not racially motivated.  As discussed above, these incidents were the subject of conflicting testimony, and it was up to the jury to weigh the evidence, make credibility determinations, and assess the motives of the actors involved in the light of all the evidence.  A jury verdict will not be disturbed unless it is contrary to the clear or great weight of the evidence, not merely the "greater" weight.  *See United States v. Approximately $299,873.70*, 15 F.4th at 1342; *Hewitt,* 732 F.2d at 1556. That standard is not met here.  Defendant's motion for new trial based on the weight of the evidence is denied.

<u>Admission of Evidence</u>

Defendant argues that the Court erred in admitting evidence of a "Black Suspects" book.  Defendant argues the book was irrelevant because it had not been used for twenty years and had no impact on Plaintiff's employment.  However, the book was part of Plaintiff's work environment.  He testified that he had heard of the book even before he personally observed it on the shelf in the detectives' room of the VPD headquarters, and that it "mortified" him.  Any impact on Plaintiff's employment was for the jury to determine.  Defendant's witnesses offered no explanation as to why the book was allowed to remain on display on the shelf.  It was therefore for the jury to determine, considering all the evidence, whether the book's continued presence was simply an unexplained oversight or a symptom of a more pervasive problem at the VPD.

Defendant argues that the Court erred in allowing evidence of a "smiley" face with a bullet hole in it appearing on Officer Long's laptop.  In denying Defendant's motion for summary judgment based on the record as it existed at the time, the Court stated that the smiley face image did not contribute to a hostile work environment.  At trial, however, Plaintiff testified that, close in time to the banana incident involving Long and Plaintiff's complaints about the incident to supervisory personnel, Long told Plaintiff the smiley image reflected what "happens to snitches."  This evidence was relevant to Long's motives and intent and was properly admitted.

Defendant complains that Plaintiff was allowed to present "comparator" evidence in the form of Plaintiff's testimony regarding the internal affairs

investigation of Plaintiff initiated by Sergeant Gregoire and Lieutenant Resch. As discussed above, the jury could have found this investigation was motivated by Plaintiff's race. The Court specifically instructed the jury – at Defendant's request and over Plaintiff's objection – that Defendant could take disciplinary action for any reason as long it was not based on race. Defendant's evidence placed this event in context and showed that Plaintiff was never disciplined, and Defendant's motion fails to explain how Defendant was prejudiced by its admission.

Defendant argues that the Court should not have admitted a letter from Plaintiff's attorney to Defendant (Doc. 142-4, Pl. Ex. 39) complaining about various procedural matters only tangentially relating to Plaintiff's claims of discrimination. The Court agrees that the letter's relevance was slight, if any. However, its admission was not prejudicial because Defendant's trial presentation placed the letter in context, and the jury was fully capable of reading the letter and determining its relevance and weight. Defendant's motion for new trial based on these evidentiary issues is denied.

<u>Jury Verdict</u>

Finally, Defendant seeks a new trial based on the Court's resubmission of the case to the jury following an initial verdict that betrayed juror confusion. The jury was asked by special interrogatories to answer "Yes" or "No" to the following questions about the elements of Plaintiff's hostile work environment claim:

1. That a member of the City of Venice Police Department harassed Officer Webb because of his race?

2. That the harassment created a hostile work environment for Officer Webb?

3. That Officer Webb's supervisor knew, or in the exercise of reasonable care should have known, about the hostile work environment?

4. That Officer Webb's supervisor took prompt remedial action to eliminate the hostile work environment?

5. That Officer Webb suffered damages because of the hostile work environment?

6. That Kenite Webb should be awarded damages to compensate for emotional pain and mental anguish?

(Doc. 138). A "Yes" answer to each of Questions 1-3 and 5 indicated satisfaction of an element of Plaintiff's claim, and the jury was therefore instructed to stop its deliberations if it answered "No" to any of these questions. The fourth question, in contrast, asked the jury whether Defendant *took* prompt remedial action to eliminate the hostile work environment. A "Yes" answer to this question would, in effect, negate an element of Plaintiff's claim, and the jury was instructed to stop its deliberations in the event of a "Yes" answer.

The jury initially answered "Yes" to Question 4, but then, contrary to the instructions, continued on to answer Questions 5 and 6 and to award Plaintiff $50,000 in damages. After a colloquy with counsel outside the presence of the jury, the Court resubmitted the case to the jury, directed the jury's attention to its answer to Question 4 and the instruction to stop deliberating if it answered "Yes," and asked the jury to clarify its answer. The jury returned with a verdict changing the "Yes" answer to Question 4 to a "No," thereby resolving the inconsistency.

As Defendant acknowledges, a Court faced with an inconsistent verdict has the discretion to direct the jury to further consider its answers rather than ordering

a new trial.  *See Wilbur*, 393 F.3d at 1199; *Burger King Corp. v. Mason*, 710 F.2d at 1489 & n.5; *In re: Wright Med. Tech., Inc. Conserve Hip Implant Prods. Liab. Litig.*, 178 F. Supp. 3d 1321, 1337-38 (N.D. Ga. 2016).  An inconsistency exists where, based on the answers themselves and on the "pleadings, evidence, argument, [and] jury instructions," the "answers given by the jury may [not] fairly be said to represent a logical and probable decision on the relevant issues as submitted." *Wilbur*, 393 F.3d at 1200 (internal quotation omitted).

That was the case here.  The jury's continuing to answer questions after the affirmative answer to Question 4 was inconsistent with the instruction to stop deliberating.  That answer, which negated Defendant's liability, was also inconsistent with the affirmative answer to Question 6 asking whether damages should be awarded to Plaintiff.  *See Wilbur*, 393 F.3d at 1197-1200 (holding in Title VII case that jury answers to special interrogatories foreclosing liability were inconsistent with the jury's affirmative answer to the same question posed here, i.e., whether Plaintiff "should be awarded damages to compensate for emotional pain and mental anguish").

The affirmative answer to Question 4 was also inconsistent with the jury's answers to Questions 2 and 3, by which the jury found that a hostile work environment existed and that Defendant was on notice of it.  Given those answers, and the evidence presented at trial, it was neither "logical [nor] probable" that the jury would nevertheless conclude that Defendant took prompt remedial action to eliminate the hostile work environment.  As set forth above, Defendant denied that a hostile work environment existed and took no affirmative steps to prevent the

misconduct from occurring. Defendant's investigation of Plaintiff's January 2020 internal complaint took place long after the incidents described above had occurred, did not mention race, concluded no hostile work environment existed, and resulted in no further action being taken. It is highly unlikely the jury concluded this belated investigation constituted "prompt remedial action."

Defendant argues the jury's verdict cannot stand because the jury may have changed its answer to Question 4 solely to justify its damage award retroactively. For the reasons just discussed, however, the jury's initial "Yes" answer to question 4 made little sense. The most probable and logical explanation is that the jury misunderstood Question 4 because of the way the instructions and verdict form were framed. [10] The instructions told the jury that Plaintiff had to prove that "Officer Webb's supervisor *failed to take* prompt remedial action to eliminate the hostile work environment." The special interrogatory, however, turned this element around and asked the jury whether "Officer Webb's supervisor *took* prompt remedial action to eliminate the hostile work environment." It is easy to see why the jury might initially have assumed the special interrogatory tracked the instruction and asked whether the supervisor had *failed* to take action to remedy the hostile work environment. A jury is presumed to follow the court's instructions and to evaluate the evidence as directed in reaching its verdict. *See, e.g., U.S. v. Shuler*, 373 F. App'x 949, 953 (11th Cir. 2010). There is no reason to think the jury disregarded its instructions or the evidence in considering the case on resubmission.

---

[10] The jury instructions and verdict form proposed by the parties and given by Court follow Pattern Instruction 4.7 of the Eleventh Circuit Pattern Instructions, Civil Cases (February 2019 revision).

The Court therefore denies Defendant's motion for a new trial based on the resubmission of the case to the jury.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

1. Defendant's oral motion for judgment as a matter of law at trial (Docs. 133; 136) and "Defendant's Renewed Motion for Judgment as a Matter of Law or in the Alternative a New Trial" (Doc. 150) are **DENIED**.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 27th day of July, 2022.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**